4  UNITED STATES OF AMERICA,              )
                                          )
5                   Plaintiff,            )
                                          )        Case No. CR 11-135
6        vs.                              )        Milwaukee, Wisconsin
                                          )
7  ARVIND AHUJA,                          )        February 1, 2013
                                          )        1:30: P.M.
8                   Defendant.            )

9 ----------------------------------------------------------------

10                **TRANSCRIPT OF SENTENCING HEARING**
           BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
11                UNITED STATES DISTRICT JUDGE

12 APPEARANCES:

13   For the Plaintiff
     UNITED STATES OF AMERICA:       Office of the US Attorney
14                                   By: TRACY M. JOHNSON
                                     517 E Wisconsin Ave - Rm. 530
15                                   Milwaukee, WI 53202
                                     Ph: 414-297-1580
16                                   Fax: 414-297-4394
                                     tracy.johnson@usdoj.gov
17
                                     United States Department of
18                                   Justice DC
                                     By: MELISSA S. SISKIND
19                                   Tax Division - Ben Franklin
                                     Station - PO Box 972
20                                   Washington, DC 20044
                                     Ph: 202-514-5196
21                                   Fax: 202-616-1786
                                     melissa.s.siskind@usdoj.gov
22
     U.S. Official Reporter:         JOHN T. SCHINDHELM, RMR, CRR,
23                                   johns54@sbcglobal.net

24   Proceedings recorded by computerized stenography,
     transcript produced by computer aided transcription.
25

```
 1    APPEARANCES CONT'D:

 2    For the Defendant              Friebert, Finerty & St. John SC
      ARVIND AHUJA:                  By: SHANNON A. ALLEN
 3    (Present)                      Two Plaza East - Ste 1250 - 330 E
                                     Kilbourn Ave
 4                                   Milwaukee , WI 53202
                                     Ph: 414-271-0130
 5                                   Fax: 414-272-8191
                                     saa@ffsj.com
 6
                                     Winston & Strawn LLP
 7                                   By: DAN K. WEBB
                                         THOMAS L. KIRSCH II
 8                                   35 W Wacker Dr
                                     Chicago , IL 60601-9703
 9                                   Ph: 312-558-5600
                                     Fax: 312-558-5700
10                                   dwebb@winston.com
                                     tkirsch@winston.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S (1:47 p.m.)

2          THE CLERK:  Case No. 2011-CR-135, United States of

3     America vs. Arvind Ahuja.  This matter is before the Court for

4     sentencing.  May we have the appearances, please?

01:47    5          MS. SISKIND:  Good afternoon, Your Honor.  Melissa

6     Siskind and Tracy Johnson on behalf of the United States, and

7     we're joined by Special Agent Geoffrey Cook of the IRS.

8          THE COURT:  Good afternoon.

9          MR. WEBB:  Your Honor, on behalf of Dr. Ahuja, Dan

01:47   10     Webb, Tom Kirsch and Shannon Allen are all present in the

11     courtroom, and Dr. Ahuja is present in the courtroom.

12          THE COURT:  Good afternoon to all of you as well.

13          PROBATION OFFICER:  Good afternoon, Your Honor.  Mike

14     Karolewicz from U.S. Probation.

01:48   15          THE COURT:  Good to see you, Mr. Karolewicz.

16          At the outset the Court would like to address the

17     defendant's motion for judgment of acquittal.

18          The parties have submitted very well-written briefs on

19     the subject and the Court has read all of those filings.  Is

01:48   20     there anything you would like to add to this matter, in brief?

21          MS. SISKIND:  Not from the government, Your Honor.

22          MR. KIRSCH:  Your Honor, yes.  I would just like to

23     say a few things and I'll just say them very briefly.

24          Your Honor, with respect to the government's argument,

01:48   25     the government's first argument, I just want the record to be

3

1    clear on this.  With their argument regarding Count 4 and their

2    first theory of prosecution that Arvind Ahuja knew of his

3    duty --

4         Well, it's somewhat confusing.  They present the

01:48    5    argument that Dr. Ahuja knew of his duty to report interest

6    income on his tax return.  That is not what's at issue here.

7    That's not what the government is required to prove.  And that's

8    not in dispute.

9         The government spends their brief arguing that

01:49    10   Dr. Ahuja was aware of a legal duty to report interest income on

11   his tax returns.  That is not in dispute.  What is in dispute

12   and what the government largely ignores, is whether or not

13   Dr. Ahuja knew that his foreign interest income from HSBC was

14   not reported on his 2009 tax return.  There the government cites

01:49    15   two things:

16        One, that he signed his tax return.  Which is not

17   enough.

18        Two, that he played an active role in the management

19   of his offshore accounts.  My response to that is, so what?

01:49    20   That doesn't have anything to do and does not establish at all

21   that he knew that his interest was not being reported on his tax

22   returns or that he was not receiving 1099s from HSBC.

23        In response to our argument -- Your Honor, that's the

24   government's whole case on that issue.  The jury rejected it.

01:50    25   It was the same argument the government made for '06, '07 and

1    '08.  The jury rejected it in '06, '07 and '08, so it's easy to

2    conclude that they rejected it for '09 because there's no

3    additional evidence with respect to that in '09.

4        The government responds that the interest income could

01:50  5    have been calculated another way even though he hadn't received

6    1099s.  That's a red herring.  In order to calculate the

7    interest income another way, from bank statements or from screen

8    shots, he first would have had to know that he wasn't receiving

9    1099s or that the income wasn't being reported on his tax

01:50  10   returns.  He didn't know those things and that's what the

11   government failed to prove.

12       So, first of all, that goes to our Rule 29 motion.

13   That also goes to our argument that the base offense level in

14   this case is 6.

01:51  15       With respect to the second part of Count 4, I'll be

16   very brief.  This is with respect to the Schedule B issue.  The

17   government again cites essentially two things:

18       First, with respect to the Schedule B issue they rely

19   on the two meetings that Dr. Ahuja had with Mark Miller in 2009,

01:51  20   one in August and one in December.  But, Your Honor, Schedule B

21   was never discussed at these meetings.  And as indicated in our

22   briefs it was Mark Miller, he testified here before the Court

23   that he was the one that checked "no" on a Schedule B without

24   discussing it with Arvind Ahuja.

01:51  25       Then there's the evidence of the Citibank 1099.  Mark

1    Miller was in possession of the Citibank 1099 which showed and

2    demonstrated that Arvind Ahuja had a foreign account.  Mark

3    Miller missed it.  And, Your Honor, I'm not blaming this on Mark

4    Miller.  Mark Miller testified about the difference between

5    foreign investments and foreign accounts, and it's a thorny

6    subject.  But the government can't have it both ways.

7            THE COURT:  It's not that thorny.  It's not that

8    thorny.  I have to reject your view that this is some mystical

9    thing that only people who are engaged in the preparation of tax

10   returns can understand.  The record here does not support the

11   argument you are making in that respect.

12           Go on.

13           MR. KIRSCH:  Your Honor, I'm not -- I'm just citing to

14   Mark Miller's testimony with respect to his testimony.

15           THE COURT:  I know what he said.  He said this is a

16   matter that is discussed among professionals, if I recall

17   correctly.

18           MR. KIRSCH:  That's right.

19           THE COURT:  He didn't say it was so complex that a

20   layperson, an individual taxpayer, U.S. taxpayer, would have

21   difficulty understanding.  Particularly if that person has

22   experience with respect to generation of interest income, the

23   receipt of 1099s, and the payment of federal income taxes.

24           And there is certainly no suggestion here -- in fact,

25   the record would certainly demonstrate that there is no evidence

1    that Dr. Ahuja was, during any of the relevant years, unaware of

2    interest that was being generated when he made investments,

3    particularly investments in CDs.

4            So regardless of whether those CDs or accounts -- bank

5    accounts were in the United States or outside of the United

6    States, the record demonstrates that Dr. Ahuja was aware that

7    such accounts generate income that is taxable.

8            MR. KIRSCH:  I agree with that, Your Honor.  I agree

9    with that.  I agree with that.  I think the issue is whether or

10   not he knew they weren't reported on his tax returns, not

11   whether or not he knew that he was receiving interest income

12   from HSBC.

13           The only other point that I would --

14           THE COURT:  Are you suggesting that the record does

15   not show Dr. Ahuja was aware that he had more accounts than were

16   reported on with respect to any one of the -- any one of his tax

17   years 2005 through 2009?

18           MR. KIRSCH:  I'm not sure I understand, Your Honor.

19           THE COURT:  Well, essentially what you're suggesting

20   is your client did not know that he had income that was being

21   generated in multiple accounts in various banks in the United

22   States and, of course, outside of the United States.  And -- go

23   ahead.

24           MR. KIRSCH:  I'm not trying to suggest that.  I

25   recognize that he knew that he was receiving interest income.

1    That's not the issue.  The issue is whether or not he knew that

2    the interest income from HSBC was not being reported on his

3    1099s.

4            THE COURT:  That's true.  And if he was aware that he

5    had accounts that were generating income, particularly accounts

6    with seven figures, there is nothing in this record to suggest

7    that he could not and he was not, in fact, aware that there was

8    something about those accounts that needed to be looked into and

9    reported.  Especially after he had multiple -- he had meetings

10   with his tax preparer and on a number of occasions was alerted

11   to what he needed to do to accurately report his income,

12   especially in 2009.

13           MR. KIRSCH:  Your Honor, may I have one second?

14           THE COURT:  Go ahead.

15           (Brief pause.)

16           MR. KIRSCH:  Your Honor, I want to address the two

17   meetings in 2009 very briefly.  But I first want to call the

18   Court's attention, we cite this case from the Seventh Circuit,

19   U.S. vs. Peters, which is 153 F.3d 445, and it talks about what

20   the government has to prove in order to prove a willful tax

21   violation.  And the Seventh Circuit writes, and I quote:

22           *"A failure to report income correctly may be due to*

23   *mistake, inadvertence, reliance on professional advice, honest*

24   *difference of opinion, negligence"* --

25           THE COURT:  I believe you cited that in your brief.

1    MR. KIRSCH:  Yes.  But I just was going to go on to

2  say "negligence or carelessness."

3    THE COURT:  Yes.  I'm certainly keenly aware of that.

4    MR. KIRSCH:  Your Honor, I just very briefly want to

5  discuss those two meetings in 2009.  In 2009 they never

6  discussed Schedule B.  And Mark Miller, in fact, testified--

7    THE COURT:  I think that you can't discuss 2009 in a

8  vacuum.  You have to look at the years prior to that as well in

9  determining whether or not your client is essentially claimed to

10  be the ostrich who is putting its head into a hole and ignoring

11  what's going on around it.

12    Or, that your client was just totally uninformed when

13  it came to what he had to report to Mr. Miller.

14    MR. KIRSCH:  Your Honor, I certainly agree with that,

15  that you've got to look at '05, '06, '07 and '08.  But in those

16  years there was no discussion whatsoever about Schedule B.

17    And you mentioned the ostrich, and clearly there's an

18  ostrich instruction but --

19    THE COURT:  But if I recall correctly, on the 1040

20  form there is a reference on that form to Schedule B.  Am I

21  wrong?

22    MR. KIRSCH:  Schedule B is part -- I think

23  Schedule B -- I don't know if it is.  I think it just -- I don't

24  know if it does or not.  But Schedule B is a tax return and it's

25  filed and I don't have any dispute with what Schedule B says.

9

1        But, Your Honor --

2        THE COURT:  Let me interrupt and ask Ms. Siskind

3   whether that is so.

4        MS. SISKIND:  Your Honor, the Schedule B is part of

01:59   5   the 1040.  The FBAR is the separate form that --

6        THE COURT:  But I'm talking about a line on these

7   additional -- there's a front page to the schedule to a 1040

8   form.

9        MS. SISKIND:  The first page of the 1040 accumulates

02:00  10   information from other schedules.  So the Schedule B, the final

11   line item on the Schedule B carries over to the front page of

12   the 1040.

13        THE COURT:  So there is a reference on the front page

14   of the 1040 form to Schedule B.

02:00  15        MS. SISKIND:  Yes.  Correct, Your Honor.

16        THE COURT:  All right.  That's all I wanted to know.

17        Go ahead.

18        MR. KIRSCH:  Your Honor, it mentions -- Schedule B was

19   filed.  It mentions nothing on the front page of the 1040 as to

02:00  20   whether or not there were foreign accounts.  That nowhere

21   appears on the Form 1040.

22        THE COURT:  The reason I interrupted Ms. Siskind is

23   because you suggested that there was no discussion of

24   Schedule B.  The mere fact that there was not any specific

02:00  25   discussion that Mr. Miller said he recalls, that doesn't mean

1    Schedule B was not discussed.

2           More important, it doesn't say that Schedule B was not

3    something that your client was aware of or should have been

4    aware of particularly in view of the execution of the form on

5    multiple years including 2005, 2006, 2007 and 2008.

6           MR. KIRSCH:  Your Honor, I don't dispute that at all

7    with respect to Schedule B.  But it's one specific question on

8    the bottom of Schedule B in very small print that we're talking

9    about.  Not just Schedule B.  He filed Schedule B.

10          We're not just -- and this is -- I wanted to address

11   the Court's comments about the ostrich because I think this is

12   very, very important.  Your Honor, the standard here is not

13   knowingly.  The ostrich -- it refers to -- the standard here is

14   willfulness.

15          THE COURT:  That is correct.

16          MR. KIRSCH:  The government has to prove that he knew

17   of a specific legal duty.  That's totally different -- there's a

18   majority of the cases that are prosecuted in the United States

19   where knowingly is -- even state courts, federal courts, the

20   standard is typically knowingly.  If you hit somebody you don't

21   have to know the elements of battery; you just know what you did

22   and you're guilty of battery.

23          Here the government has to prove that he knew of a

24   specific legal duty.  And, Your Honor, I respectfully submit

25   that in 2006 through 2009, there's no evidence that the

11

1    government can point to that he knew of the specific legal duty

2    to answer that question on Schedule B.  And I say that because

3    the only evidence that the government cites the Court to, the

4    only evidence, are the two meetings between Arvind Ahuja and

02:02   5    Dr. Miller in 2009, and the fact that he signed his return.

6        But the meetings in 2009, it's very important that

7    these meetings in August and December of 2009, Schedule B, or

8    the specific legal duty contained on Schedule B to report a

9    foreign account, was never discussed.

02:02   10        So 2009 doesn't get him there.  Excuse me, those

11    meetings.  The signature on the tax return doesn't get him

12    there.  The Court's well aware that that's prima facie evidence,

13    but it's not enough.  You've gotta consider the surrounding

14    circumstances and facts.

02:03   15        And here I respectfully ask the Court to take into

16    account -- I think Mr. Miller testified that on August 15th

17    Dr. Ahuja signed 25 tax returns or so.  Hundreds of pages.

18    Your Honor, he didn't read these returns.  Mark Miller

19    essentially testified to that.  He said they were prepared on

02:03   20    April 15th, they were given to him, they were signed, and they

21    were filed.

22        So, Your Honor, the record lacks any evidence that

23    Dr. Ahuja was specifically aware of the legal duty to answer the

24    question on Schedule B, I think it's Section 3, I think it's

02:03   25    Question 7, as to whether or not he has an interest in a foreign

12

1    bank account.  The government did not prove that.  And for those

2    reasons we believe Count 4 must be dismissed as a matter of law

3    under Rule 29.

4            With respect --

5            THE COURT:  Let's have the government reply to that

6    before we go to the next item.

7            MR. KIRSCH:  Yes, Your Honor.  Yes, Your Honor.

8            MS. SISKIND:  Your Honor, I don't want to go too much

9    over everything we've gone through in our papers, but I would

10   submit that there's a simple proposition in -- for return

11   preparation: that a tax return can only be as accurate as

12   information a taxpayer gives to the return preparer.

13           Dr. Ahuja knew that his accounts were not being

14   reported because he didn't tell his accountant that he had these

15   foreign bank accounts.  How would Mr. Miller know otherwise that

16   there were foreign accounts if not for his client telling him?

17           And it wasn't as if Mr. Miller didn't try to get this

18   information.  We heard about the August 2009 meeting where

19   Mr. Miller asked Dr. Ahuja if he had any foreign bank accounts.

20   Dr. Ahuja said at that point that he would follow up to see if

21   he had any but there was nothing that the accounting firm had to

22   do at that point.  And Mr. Miller testified that Dr. Ahuja never

23   followed up, never told his accountant that he had these foreign

24   bank accounts, even when he was specifically asked about them.

25           Then there's the December 2009 meeting where there was

1    the agenda item talking about FBAR reporting requirements and

2    foreign bank accounts.

3          There's the December 2009 cover letter to the tax

4    organizer speaking about some changes in tax law that mentioned

02:05    5    foreign bank account reporting.

6          These were opportunity after opportunity for Dr. Ahuja

7    to come clean and tell Mr. Miller he had foreign bank accounts,

8    but he continued to conceal them throughout that time period.

9    That's how he knew the accounts weren't being reported, because

02:05    10   he never disclosed them.

11         And we would submit that is sufficient for a finding

12   of willfulness because he knew of his legal duty to report them.

13   Mr. Miller told him of his legal duty, informed him time and

14   time again, and he intentionally failed to report those to his

02:05    15   accountant.

16         THE COURT:  The Court is denying the motion with

17   respect to this count.  I do so fully aware that the defendant

18   claims he lacked the requisite willfulness to make or subscribe

19   to a false return.

02:06    20         I also am mindful that the Court has to look at the

21   facts in a light most favorable to the government under the

22   circumstances.  And here, given all the circumstances — not just

23   the fact that the defendant executed his tax return — there was

24   evidence that:

02:06    25         Dr. Ahuja was quite aware of the generation of

14

1    interest income;

2           He knew that he had income that was coming from

3    outside of the United States;

4           He knew that he was, in fact, receiving 1099s for some

02:07  5    of his accounts;

6           He had substantial funds, more than seven figures

7    invested outside of the United States, and;

8           He engaged in multiple transactions including a trip

9    to Citibank that demonstrate his awareness of what was happening

02:07 10    with respect to his foreign bank accounts and particularly the

11    HSBC -- I should say especially HSBC account.

12           That the language on the 1040 respecting Schedule B

13    was small certainly is not supportive of the defense suggestion

14    that Dr. Ahuja, in the midst of signing multiple tax returns,

02:08 15    was not aware of the need to report interest income on his

16    Schedule B.

17           I have to say somewhat tongue in cheek that Dr. Ahuja

18    is a neurosurgeon.  He's used to dealing with stuff that's very,

19    very small.  Perhaps he has much greater awareness of things

02:09 20    that are small than most folks.  And I find it difficult to

21    conclude that the jury would have missed that fact in its

22    deliberations.

23           Dr. Ahuja, according to the evidence, was and remains

24    a sophisticated person with regard to finances.  Indeed the

02:09 25    evidence, if I recall it correctly, indicates that he signed

1 some forms acknowledging his intimate knowledge of finances and

2 his day trading and his comfort level with investments.

3 And when I take that into account I can't conclude

4 that the jury was uninformed with respect to the need to

02:10 5 consider whether or not Dr. Ahuja acted willfully when he failed

6 to report his interest income.

7 Does the defense wish to be heard further?

8 MR. KIRSCH: Your Honor, do you want me to address

9 Count 7 briefly?

02:10 10 THE COURT: Yes. If you wish to. It's certainly not

11 necessary. You have a very, very well-crafted brief. And

12 unless there's something different that you'd like to point out,

13 then it will not be absolutely essential that you be heard

14 further.

02:11 15 MR. KIRSCH: Your Honor, I just want to point the

16 Court to Jury Instruction Number 24 which requires that

17 Dr. Ahuja knew it was his legal duty to file an FBAR. The

18 government did not and cannot prove that Dr. Ahuja knew of a

19 specific legal duty to file an FBAR. That's our argument. His

02:11 20 signature on the tax return is not enough. FBAR was never

21 discussed with him.

22 That's our argument, Your Honor. I think it's in the

23 brief. I'm happy to answer any questions you may have on that.

24 THE COURT: Ms. Siskind?

02:11 25 MS. SISKIND: Your Honor, just to point out that FBAR

16

1    was discussed with him.  It was on an agenda.  It was on a tax

2    organizer.  That word "FBAR" was raised with the defendant.

3    It's not some obscure form that he can claim he's never heard of

4    because Mr. Miller and the accounting firm took it upon itself

02:11  5    to make sure its clients were aware of this legal requirement.

6           THE COURT:  I agree.  More need not be said.  The

7    defense motion is defined.  Therefore, the Court declines to

8    grant the defendant's motion for a judgment of acquittal.

9           With that, I turn to the presentence report.  I note

02:12  10   at the outset that following the jury's verdict in this matter

11   the Court directed that a presentence report be prepared.  That

12   report has been submitted and the parties have responded to the

13   same with the filing of objections as well as sentencing

14   memoranda.

02:12  15          The Court is also in receipt of case law particularly

16   with regard to matters concerning acquitted conduct.

17          Further, the Court has a number of references to

18   comments of parties respecting sentencing.

19          Dr. Ahuja, have you had a chance to go over the

02:13  20   sentencing materials with your counsel?

21          THE DEFENDANT:  Yes, I have.

22          THE COURT:  Do you believe that you've had a

23   sufficient opportunity to discuss with your counsel all matters

24   that are of concern to you today?

02:13  25          THE DEFENDANT:  I may not have discussed all the

1    details with the accountant before, but I have discussed this in

2    detail with my lawyer.

3         THE COURT:  And what's key here is whether or not

4    you've discussed things with your lawyer.  And if there's

5    anything affecting sentencing that you'd like to review with

6    your counsel before we go any further, I'll give you a chance to

7    do so right now.

8         THE DEFENDANT:  No, I do not need to.  Thank you.

9         THE COURT:  All right.  That being so I'd like to hear

10   from the defense with regard to its objections, in particular

11   the objection concerning the sophisticated means of executing

12   the scheme in this case.

13        MR. KIRSCH:  Yes, Your Honor.  Can I just start right

14   there with sophisticated means?  If that's okay with the Court?

15        THE COURT:  Yes.

16        MR. KIRSCH:  Okay.  Your Honor, we cite in our papers

17   that "sophisticated means" means "especially complex or

18   especially intricate offense conduct pertaining to the execution

19   or concealment of an offense."

20        United States vs. Stokes, which we cite in our paper,

21   says that there's nothing sophisticated about not disclosing

22   income to your accountant.  And essentially that's the

23   government's case.

24        Your Honor, if these bank accounts were in the United

25   States there would be absolutely no sophisticated means

1    enhancement applicable.  None.  There's just no way that the

2    government could argue that Dr. Ahuja attempted to conceal from

3    the IRS.

4           I mean, if you look at the record here, sophisticated

5    means, Your Honor, as the Court is well aware in tax cases, is

6    applied: when shell corporations are used; when things are done

7    not in the defendant's own name; when things are done to

8    deliberately conceal from others.

9           And that's not what happened here.  Arvind Ahuja

10   opened a bank account at HSBC in New York.  He transferred money

11   from his US Bank account in Milwaukee to his account in

12   New York.  He openly communicated with these HSBC bankers about

13   all sorts of matters by e-mail.

14          I mean, I suggest to argue sophisticated means here is

15   such a stretch by the government.  The best the government can

16   do is point to the change of address.  That's the best they

17   could do.  But their own witness, Ramit Bhasin, testified --

18          THE COURT:  You're referring to the change of address

19   to the address in India?

20          MR. KIRSCH:  Yeah.  But, Your Honor, do you remember

21   Mr. Bhasin, at page 333 and 331 -- I'll cite to the transcript.

22   He addressed this.  He straightened this all out and he said

23   that it had nothing to do -- it had nothing to do with any sort

24   of effort at concealment.  It had to do with the fact that

25   Dr. Ahuja had made a million-dollar investment with Mr. Bhasin

19

1    when he worked in a company called Oxus Investments.

2            He was moving to Mann Financial, and in order to move

3    the money Dr. Ahuja had to have some sort of document with an

4    Indian address on it.  Ramit Bhasin, and I remember specifically

5    this testimony because I remember when Mr. Webb asked Mr. Bhasin

6    about this and started talking about tax implications,

7    Mr. Bhasin had this puzzled look on his face.

8            THE COURT:  Let me interrupt and just let you know

9    that at this point the scale is in your direction.

10           MR. KIRSCH:  I have nothing else to say on that issue,

11   Your Honor.

12           THE COURT:  I'm having some trouble with the

13   government's argument in this connection.  Because as the

14   defense has pointed out, essentially what you've asserted and

15   presented as evidence in this case is that Dr. Ahuja didn't tell

16   his accountant about these accounts.  And if that is it,

17   everything else related to his failure to tell his accountant

18   about the accounts is very, very minor.

19           MS. SISKIND:  Your Honor, it's more than just the

20   simple failure to tell his accountant about the accounts.  The

21   use of offshore bank accounts, one of the reasons that it's

22   listed in the sophisticated means enhancement as an example of

23   what might be sophisticated is that offshore bank accounts are

24   inherently nontransparent.

25           By putting one's money offshore it significantly

20

1   decreases the chance that the U.S. Government will ever learn

2   about it.  Because as we learned at trial, foreign banks don't

3   issue Forms 1099 and the jurisdiction of the grand jury and the

4   court to obtain compulsory processes and records from these

5   banks is significantly limited.

6        So that is why the use of an offshore bank account is

7   something that is sophisticated; is more than just a mere

8   failure to tell an accountant about some information.  It's an

9   affirmative step designed to prevent the government from

10   learning about the income generated in that account.

11        Now, we also pointed out that there were transactions,

12   affirmative steps the defendant took to further ensure that the

13   account would not become known to his accountant and to the

14   government.  There was the change of address which I think is

15   more significant than the defense points out.

16        Ramit Bhasin can say whatever he wants about why he

17   thinks the defendant changed the address.  But the fact is that

18   the -- by changing the address the defendant prevented any

19   account-related correspondence from coming to his house in the

20   United States where it could have been accidentally turned over

21   to his accountant among these other 1099s and financial

22   documents that he was given.  It didn't even raise that

23   possibility because if the record never comes into this country,

24   there's no chance of it being given to his accountant and for

25   that income making its way on his tax return.

1    So, by using the forward address; by, for example, the

2    account closure of the Jersey account; the -- we talked about

3    this and it didn't come in at trial because there were a lot of

4    documents that were not admissible at trial but I think it is

5    relevant for this purpose.  He closed the account.  A check was

6    mailed to him.  If he had no intent to conceal the existence of

7    that account from the government, then why didn't he deposit

8    that in his US Bank account here in Milwaukee and then wire the

9    funds to India?  Instead, he handed the check off to -- likely

10   handed the check off to an HSBC banker at a meeting in New York,

11   who then sent it to the UK for processing to be credited to his

12   India account.

13   That type of transaction is the very type of

14   sophistication that the drafters of the guidelines had in mind

15   with this enhancement.  It is not the usual banking transaction

16   that would be considered non-sophisticated.  It is something

17   much more than that and something calculated at concealing

18   foreign accounts from the government.

19   We would recognize that there's always a continuum of

20   what constitutes sophisticated means.  And the government's not

21   saying that this is most sophisticated scheme in the history of

22   fraud in this country.  But it does meet the test for what is

23   sophisticated means under the guidelines.  The defendant used

24   foreign accounts.  He concealed transactions.  And it wasn't

25   just a mere failure to disclose.  There were affirmative steps

1    calculated from preventing the government from learning about

2    his bank accounts.

3            THE COURT:  Mr. Kirsch?

4            MR. KIRSCH:  Yes.  Would you like me to respond to

02:21    5    that, Your Honor?

6            THE COURT:  Please do.

7            MR. KIRSCH:  Your Honor, the government talks about --

8    first they talk about offshore bank accounts being inherently

9    nontransparent.  Well, we know that's not the case.  Dr. Ahuja

02:21    10    had an account at Citibank that was a foreign account.  He got a

11    1099.  There's nothing wrong with that.

12            There's no evidence that he opened an account at HSBC

13    — in New York, by the way — to somehow conceal assets from the

14    government.  If that was the case I submit he would not have

02:22    15    opened the account in the United States, but he did.

16            The change of address is a complete red hearing.  I

17    mean, he had this account since 2001.  He changes the address

18    sometime in 2008, indicating that his address had been

19    Greendale, Wisconsin from 2001 to 2008.  That certainly can't --

02:22    20    for seven years they have his account being in Wisconsin.  He

21    changes it.  Mr. Bhasin tells you -- anyway.

22            THE COURT:  I don't recall any testimony regarding

23    1099s that may have been issued for such accounts back in 2001.

24    Do you have any references to the record or anything that you

02:22    25    can point out in the record that would address that?

1    MR. KIRSCH:  I don't think there's anything in the

2  record, Your Honor.  The government has not set forth any

3  evidence that he had received a 1099 in 2001 through 2009.  But

4  this was a policy of HSBC, that particular bank.  But he had

02:23  5  other accounts where he did -- that were foreign accounts where

6  he did receive 1099s.

7    So I don't think the government can argue that he

8  employed sophisticated means by having some foreign accounts

9  where he didn't receive 1099s and some where he did.

02:23  10    Your Honor, it's also important to point out there's

11  absolutely no evidence in the record — none — that Arvind Ahuja

12  knew that he wasn't receiving 1099s.  The government called four

13  witnesses.  Nobody ever testified that Arvind Ahuja was ever

14  told at any time by anybody, anybody at HSBC, Mr. Bhasin or

02:23  15  anybody else, that he would not be receiving 1099s from HSBC.

16  It never happened.  HSBC never told him that.  Certainly if they

17  had, the government would have put that witness on the stand to

18  testify that he or she told Arvind Ahuja that he would not

19  receive 1099s.  He was never informed of that.

02:24  20    Your Honor, the government talks about this --

21    THE COURT:  I do recall something concerning some

22  forms that were executed and indicated -- that indicated that

23  the bank -- a bank would not be -- wouldn't be issuing a 1099 or

24  may not issue a 1099 and the person had to consult with their

02:24  25  tax accountant or financial advisor.

24

1        MR. KIRSCH:  I don't think that's -- I think the

2  document said -- Your Honor, they didn't mention 1099.  What

3  they said was that a taxpayer is responsible for his income and

4  has to consult with his tax advisor, which is standard language

5  whenever anybody opens any type of financial account.  It had

6  absolutely nothing to do with 1099s.  The government --

7        THE COURT:  But it has something to do with income.

8  Right?

9        MR. KIRSCH:  With income.  But it's never been our

10  position that he somehow thought that he didn't have to report

11  certain income on his tax return.  It's never been disputed in

12  this case.  The issue is whether or not -- he had this

13  tax-preparation process.  The issue is whether or not he knew

14  that he was not going to receive 1099s from HSBC.

15        THE COURT:  Well, it's a little more than that, isn't

16  it?  Isn't it more a matter of whether or not he knew that the

17  interest earned was reportable and taxable?

18        MR. KIRSCH:  Yes, Your Honor, that's correct.  But I

19  don't think there's ever been any issue as to whether or not

20  that interest was reportable and taxable.  The issue was whether

21  or not he knew what he was receiving from HSBC or what he was

22  not -- now keep in mind, he was receiving a 1099 from HSBC for

23  the money that he had in the United States.

24        THE COURT:  Yes.

25        MR. KIRSCH:  Which made it even more confusing.  He

02:24
02:24
02:25
02:25
02:25

25

1  never saw it.  He never saw the 1099.  That was explained in

2  detail.  It would have been received by Mr. Branch.  It would

3  have been turned over with hundreds of other documents to

4  Mr. Miller.  He never saw it.

5  He would have had no reason to know that that HSBC --

6  Your Honor, just, there's one fundamental thing here.  The

7  amount of unreported income on Dr. Ahuja's tax return was less

8  than 1.8 percent of his total tax liability.  Less than --

9  THE COURT:  You argued that at trial.

10  MR. KIRSCH:  I know.  But I just wanted to make that

11  point that he did not know that he was not receiving 1099s.

12  But as far as a sophisticated means enhancement, when

13  the government says that offshore bank accounts are inherently

14  nontransparent, Your Honor, the Citibank account was entirely

15  transparent.  We know that because he got a 1099, it was turned

16  over to his accountant, and the interest was reported on

17  Schedule B and the taxes were paid.

18  So there's just -- I mean, this is such a far cry from

19  sophisticated means.  The government relies on a check.  They

20  talk about this check.

21  And, Your Honor, they very carefully -- they very

22  carefully say that Dr. Ahuja likely -- he likely handed it to an

23  HSBC banker.  I mean, that is not proof of anything.  That's

24  simply speculation.

25  There is some burden of proof, although it's a lesser

26

1    burden of proof.  Certainly they can't walk in here and say,

2    well, Judge, he likely did this and therefore you should find

3    even by a preponderance of the evidence that that's what he did.

4    There's no evidence of it.  We're just purely speculating that

5    that's what he did because that's what we think he did.

6         Your Honor, that's not proof by a preponderance of the

7    evidence.  That's not anything.

8         With respect to -- the government talks about he has

9    these accounts but he opened his HSBC account in New York.  He

10   communicates with them in his own name.  For years.  No shell

11   corporation.  The accounts at HSBC are in his name.  Him and his

12   wife's name.  They're joint accounts.

13        The change of address, that was explained by Ramit

14   Bhasin.  This check in British pounds was sent to Wisconsin.  It

15   was then deposited at a bank account in Great Britain and he

16   withdrew it.  Maybe it was deposited in a bank account in Great

17   Britain because it was written in Great British pounds.  I guess

18   I don't know what I'd do with a check in Great British pounds.

19   I don't know.  But regardless, the government can't come here

20   and guess as to why -- they sent it to his address in -- that is

21   not sophisticated means, Your Honor.

22        Your Honor, may I have one second?

23        THE COURT:  Certainly.

24        (Defense counsel confer.)

25        MR. KIRSCH:  Your Honor, I just want to make one

 1    comment about Mr. Bhasin.  It was the government that called

 2    Mr. Bhasin as a truth-sayer, not the defense.

 3              THE COURT:  I recall.

 4              MR. KIRSCH:  Okay.

 5              THE COURT:  And he wasn't especially forthright with

 6    regard to his testimony.

 7              MR. KIRSCH:  I agree with that.  Although -- I

 8    certainly agree with that.  Although with respect to this issue,

 9    Your Honor, I guess -- he explained as to -- he -- and the

10    e-mails -- by the way, if you remember, the e-mails that the

11    government introduced bear out his testimony in this issue.

12    Because he was the one that sent the e-mail that told Dr. Ahuja

13    exactly what to do.  Dr. Ahuja then forwarded it to the banker

14    in New York.  He forwarded Ramit Bhasin's e-mail to the banker

15    in New York.  She then took care of it for him.

16              So it just had -- why would he send it to the banker

17    in New York if it had anything to do with concealment?  It just

18    didn't, Your Honor.

19              THE COURT:  Well, it may very well have had something

20    to do with concealment.  But when I take into account the

21    essence of what transpired here, I have to conclude, as you

22    assert, Mr. Kirsch, that sophisticated means were not employed

23    by your client in committing his offense.

24              And, therefore, the Court is sustaining your objection

25    to the presentence report and the enhancement that is applied in

1    paragraph 101 under U.S. Sentencing Guideline 2T1.1(b)(2).  I

2    don't believe the government has shown anything exceptionally

3    sophisticated about when it comes to depositing checks for

4    interest or concealing from the tax preparer funds that

5    otherwise would have been subject to tax and disclosure on

6    Schedule B of Dr. Ahuja's 1040.

7            That being so, the defendant's offense level would

8    have to be reduced by two points.

9            Let's turn now to discussion of the loss calculation

10   in this case.  Does the defense wish to be heard briefly on

11   this?

12           MR. KIRSCH:  Yes, Your Honor.  We make two arguments

13   with respect to the loss calculation:

14           First, that the base offense level should be 6

15   because there is no tax loss under the guidelines.

16           And the second argument is that even if there is tax

17   loss, it should be limited to the 2009 tax year.

18           And if I can, Your Honor -- well, as far as the base

19   offense level being 6, I argued as to why I think the base

20   offense level should be 6.  And I'm certainly happy to answer

21   any questions the Court may have on that.  But I don't think

22   there's any -- I think the jury and the Court, as the jury did,

23   rejected the theory that Dr. Ahuja willfully failed to report

24   interest income from HSBC.  The argument that the government

25   made for '06, '07, '08, and '09 was exactly the same for all of

1    those years.

2         THE COURT:  Well, I don't think that we can conclude

3    that the jury did not believe your client failed to report

4    income for the earlier years.  Instead we must conclude that the

5    jury did not believe the government had shown beyond a

6    reasonable doubt that your client had willfully failed to report

7    such income.

8         Now, when it comes to enhancements and determining

9    offense levels, a lesser level of proof is necessary; wouldn't

10   you agree?

11        MR. KIRSCH:  Absolutely, Your Honor.

12        THE COURT:  So that being so, why should the Court not

13   conclude that the government has not presented a preponderance

14   of evidence to support a base offense level of 20 instead of the

15   6 that you propose?

16        MR. KIRSCH:  Well, first of all, I don't think they

17   can get -- they can't get to 20.  Well, Your Honor, they argue

18   the base offense level I think is 18.  I don't think they argue

19   -- well, wait a minute.  No, I'm sorry, they do argue 20.  They

20   do argue 20.

21        Your Honor, they can't get to 20 because '05, '06, '07

22   and '08, they have entirely failed to show for those years, '05

23   through '08, that Dr. Ahuja did anything willfully.

24        Your Honor, we've recognized this in our papers.  The

25   evidence in '09 differs from the evidence in the earlier years.

30

1    But they can't take the evidence in '09 -- even if their

2    argument is that he learned in '09, they cite the e-mail, the

3    Ramit Bhasin e-mail which I suggest to the Court shows nothing

4    but they relied on that.  They relied on these conversations --

02:34   5            THE COURT:  Well, doesn't that e-mail show your

6    client's awareness of the need to -- well, the need to disclose

7    foreign income?

8            MR. KIRSCH:  No, I don't think it does at all.  Ramit

9    Bhasin worked at HSBC.  And Ramit Bhasin testified that

02:35  10    Dr. Ahuja would forward him Bloomberg news articles having to do

11    with HSBC sometimes two or three times a day.  So that one

12    e-mail by itself with no context, I don't think it shows that.

13    Certainly not by a preponderance of the evidence.

14            THE COURT:  Well, again, we're not just looking at

02:35  15    that piece of evidence in a vacuum.

16            MR. KIRSCH:  I agree.

17            And, Your Honor, I started by saying the evidence in

18    '09 is different than the earlier years.  But the government

19    certainly cannot take evidence from 2009 and then sort of roll

02:35  20    that back in time and say that maybe he knew in '09 when he sent

21    this e-mail to Ramit Bhasin, which was about the same time that

22    he had a meeting with Mark Miller, that because maybe he knew in

23    '09 then his actions in '08, '07, '06, and '05 were willful.

24    They can't do that.

02:36  25            And if you stop the clock on April 15th of 2009, which

31

1    is when he would have filed his -- by April 15th of 2009 his

2    returns for '05, '06, '07 and '08 had been filed, Your Honor --

3    I respectfully suggest there is no evidence — none — prior to

4    April 15th of 2009, that he willfully committed any tax

02:36  5    violation.

6          Certainly, certainly there's evidence that he didn't

7    pay tax on his HSBC interest income.  But there's no evidence

8    regarding any conversations with Mark Miller; any conversations

9    regarding Ramit Bhasin; any conversations regarding anybody at

02:36  10   HSBC.  There's nothing.

11         The government put on four witnesses.

12         Four:  Special Agent Cook;

13         The woman from HSBC, who never met Arvind Ahuja, says

14   no record of any conversations between Dr. Ahuja and HSBC

02:36  15   bankers when he opened these accounts;

16         Miller, who never ever testified to any conversations

17   with Dr. Ahuja prior to April 15th of 2009 regarding foreign

18   interest or foreign income or foreign reporting requirements.

19         There's nothing.

02:37  20   And there's Ramit Bhasin.  He didn't testify -- the

21   first thing he said as you recall, was this call -- this silly

22   conversation that he says occurred on a golf course in Pebble

23   Beach in the summer of '09.

24         So the government can't cite to a thing -- they want

02:37  25   to come in and say, well, because the jury found him guilty in

32

1    '09 he must have been guilty in '08 and going back all the way

2    to the beginning of when he opened these accounts.  That's

3    not -- Your Honor, that's simply not the way the process works.

4         For each count the government has to prove by a

5    preponderance of the evidence.  They can't do it.  They -- I

6    think -- they just can't do it, Your Honor.  And I respectfully

7    submit -- I don't know what else to say except that there's just

8    no evidence prior to April 15th of 2009 of Dr. Ahuja committing

9    any willful tax violation.

10        THE COURT:  Does the government wish to reply?

11        MS. SISKIND:  Yes, Your Honor.

12        The events of late 2008 going to 2009 do provide a

13   basis for the Court to conclude that by a preponderance of the

14   evidence that the defendant's failure to report his interest

15   income and the existence of his accounts in the earlier years

16   was willful as well.

17        Because in August and December, when he was being

18   informed that there are these foreign bank account reporting

19   requirements, if it really all had been innocent mistake all

20   those years and he really did want to come clean and say, "Oh,

21   my God, I made a mistake, I'm going to make it all right now,"

22   he would have told Mark Miller at that point about the account.

23   He would have reported it correctly in 2009.  He would have

24   amended his earlier tax returns.

25        But that's not what happened.  Even after three times

1    being informed by his accountant that there's foreign bank

2    account reporting requirements, he continued to conceal those

3    accounts from Mr. Miller.  And it's that continued concealment

4    in the face of direct knowledge about these reporting

5    requirements that speaks volumes about his intent in the earlier

6    years as well.

7            And the events of 2009, while they are highly

8    probative of his mental state, are not the only facts that

9    support a finding that he was willful in those earlier years.

10           There's the background of this defendant as a

11   sophisticated investor.  He was a day trader.  He engaged in

12   $245 million in trades in 2008.  Does it really make sense that

13   someone who is this sophisticated of an investor, this involved

14   in his financial affairs, would not look into the tax

15   consequences of these investments he was making abroad?

16           He knew he had CDs.  He knew they earned income

17   interest in all of these years.  He signed that account opening

18   form where he acknowledged that he was required as a U.S.

19   citizen to pay tax on his worldwide income.  He signed other

20   documents like the tax declaration acknowledging there were tax

21   implications to what he was doing in all of these years.

22           And he knew that this interest income was not being

23   reported on all the earlier years.  Some of the reasons we

24   discussed already; namely, that Schedule B plays prominently on

25   a line item on the first page of the tax return.  For each of

34

1    these years he knew that he was earning interest income and it

2    wasn't being reported.

3         And at the same time he was hands-on with the

4    management of this account — not just in 2009, but going back

02:40  5    through all of the years at issue.

6         He directed how money was to be spent from the

7    account.  He put money into the account.  He broke CDs.

8    Transferred money.  Checked up on interest rates.  This was not

9    some money he put over in India and forgot about.  On a regular

02:40 10    basis he was in communication with bankers about these accounts.

11         The defense keeps coming back to this issue of 1099s

12    and how this at all relates to whether he was willful in these

13    earlier years.  And the government put on evidence at trial that

14    it didn't matter that he was receiving a 1099, because even

02:41 15    absent that form he knew he was receiving interest income.  And

16    he knew how to get information from the bank if he needed to

17    know exactly how much interest he had earned.

18         We saw an example of an e-mail where Priti Dhanani,

19    his banker at HSBC, sent him a copy of his HSBC-Jersey account

02:41 20    statement when he requested it.

21         There were other examples that we cite in our

22    sentencing memorandum of bankers providing the defendant with

23    information about the specifics of his account whenever he

24    wanted it.

02:41 25         So a 1099 is not -- it's not some magical form without

1    which he was completely unable to comply with his legal

2    responsibilities with respect to reporting missed income and

3    this account.  Even without it he knew he had an account and it

4    was earning interest income.

5            We would submit that all of the facts of this case,

6    his financial savvy, his involvement with the accounts, and

7    these quite important events that occurred in late 2008 leading

8    up to the 2009 return, all taken together, can establish

9    willfulness by a preponderance of the evidence for 2005 through

10   2008.

11           THE COURT:  I concur with the government on this

12   particular point, after taking into account the involvement of

13   the defendant in his personal financial affairs, including his

14   communication with his bankers over the years, his communication

15   with his accountant regarding his filing obligations, and his

16   execution of tax returns from 2005 through 2009.

17           Therefore, the enhancement -- I should say the base

18   offense level will be -- as set forth in the presentence report

19   is adopted by the Court which, as a result, means that the total

20   base offense level in this matter would be 20 with a criminal

21   history category of I.

22           Is there any exception to that determination?

23           MS. SISKIND:  No, Your Honor.

24           THE COURT:  Mr. Kirsch?

25           MR. KIRSCH:  Subject to our earlier objections,

1    Your Honor, no.  That's a correct application of the guidelines.

2           THE COURT:  Thus, the fine range under the guidelines

3    would be from 7500 to $75,000.

4           Are there any more guideline determinations that you'd

5    like to address?

6           MS. SISKIND:  Not from the government, Your Honor.

7           MR. KIRSCH:  No, Your Honor.

8           THE COURT:  All right.  Let's now address the matter

9    of sentencing and 3553(a)(2) factors.  Does the government wish

10   to be heard with regard to sentencing?

11          MS. SISKIND:  Yes, Your Honor.

12          Your Honor, this case involves a multiyear scheme to

13   defraud the government by concealing more than $2.7 million in

14   interest income.  And what we saw over the course of the trial

15   is that it was about more than just filing a few false

16   documents.

17          The defendant didn't have a momentary lapse in

18   judgment.  This wasn't a mistake.  This wasn't an accident.

19   This was a calculated decision to conceal information from his

20   accountant and, in turn, from the IRS in order to avoid paying

21   tax on his additional income.

22          And while it's true that the defendant has since

23   amended his tax returns and paid everything that was due on that

24   income, that only happened after he learned he was under

25   criminal investigation.

37

1       It didn't happen in 2008 when Mark Miller told him

2  about foreign bank account reporting requirements.  It didn't

3  happen when he sat down in either of those meetings and talked

4  about foreign bank account reporting.  It happened after he got

02:45  5  a letter from the Department of Justice telling him that he was

6  the subject of a criminal investigation relating to his offshore

7  accounts.

8       The Court needs to, as 3553(a) makes clear, take into

9  account as well the history and characteristics of the

02:45  10  defendant.  And we've seen the letters, the binder of letters

11  from colleagues and friends and family members in support of the

12  defendant.  And they tell the story of a self-made man who came

13  to this country and achieved the American dream.  He grew up in

14  poverty and now can report a net worth of more than $63 million.

02:46  15       He could have easily paid taxes on the additional

16  income that he was earning.  And as the defense pointed out, the

17  additional tax only amounted to a fraction of what he paid in

18  each of these years.

19       So the only possible explanation for why the defendant

02:46  20  didn't report this income to the government is greed.  He had to

21  pay a lot of tax on income that he was earning in this country

22  and that he couldn't do anything about because the financial

23  institutions in the United States were already reporting that

24  income to the government.  The only place where he was able to

02:46  25  avoid paying taxes on that income that was earned offshore, at a

1       bank that was not going to tell the IRS about it.

2              And it's impossible to examine the history and

3       characteristics of this defendant without looking at his

4       employment and his family.  As the defense has pointed out he's

5       a world-renowned neurosurgeon.  He has a loving family, wife and

6       daughters, and extended family who wrote these compelling

7       letters to the Court on his behalf.  And the government is not

8       disagreeing that it is appropriate for the Court to take all

9       that into account when imposing sentence.  But the government

10      submits that what the Court should not do is allow the

11      defendant's character and his family ties to overshadow the

12      other coequal sentencing factors that the Court also must

13      consider under 3553(a).  So history and characteristics is an

14      important factor, but there are others as well that the Court

15      needs to consider.

16             And I want to make a few comments on some issues that

17      I know the defense is going to raise, particularly relating to

18      the defendant's medical license and how a sentence in this case

19      could impact his license, and also how it might impact his

20      surgical privileges at hospitals where he currently works.

21             A lot of the defendant's -- much of the defendant's

22      argument in support of a probationary sentence in this case

23      rests on the speculation about what might happen to his medical

24      license and to his surgical privileges if he's incarcerated.

25      But when the defendant goes before the Medical Board, if they

1  make a finding that unprofessional conduct occurred in his case

2  the Medical Board has a wide range of sanctions that it can

3  impose on the defendant taking into account his unique

4  circumstances.  They can be all the way from a reprimand up to

5  loss of a license.  And I don't think it's appropriate to

6  speculate what might happen when this independent fact-finding

7  body takes a look at the defendant's case and decides how to

8  proceed.

9          In his letter to the Court John Zwieg, who formerly

10  prosecuted cases in front of the Medical Board, indicates that

11  there's a higher probability that if a person's incarcerated

12  they will lose their license.  But he's not distinguishing

13  between cases like this one where it's a white collar crime and

14  a crime that really has no bearing on the defendant's ability to

15  render quality medical care or take care of his patients, versus

16  an assault or a drug case where there is a nexus between the

17  crime and the provision of medical care.

18          And I would think that the Medical Board would deal

19  differently with cases depending on the connection between what

20  the defendant is convicted of and the ability to render medical

21  care.  And I don't think that Mr. Zwieg was able to distinguish

22  which of the cases where people went to jail were tax or which

23  they were something else.

24          There's also nothing in the regulations that govern

25  the Medical Board that says that the type of sentence a person

1    receives should be some kind of determinative factor in what

2    kind of sanction the board should impose.  So it's possible that

3    if the defendant receives probation he could still lose his

4    license; or if he goes to jail he could still get it back when

02:50  5    he is released.  And I don't know that there's anything to

6    suggest a connection between the two, other than perhaps

7    anecdotal evidence.

8              And I would think that Dr. Ahuja's stature in the

9    medical community, his -- and his contributions and the esteem

02:50  10   that he is held in by his peers, is going to have a bigger

11   impact on the Medical Board's decision than the type of sentence

12   he receives.

13             The defense points out several times that Dr. Ahuja is

14   the only endovascular neurosurgeon in Milwaukee.  Well, if

02:50  15   that's the case I would think the Medical Board is a lot less

16   likely to revoke his license upon release from incarceration if

17   his services are that vital to the medical community here in

18   Milwaukee.

19             And the same is true for his privileges at hospitals.

02:50  20   The defendant no doubt brings prestige and revenue to whatever

21   hospital he practices at, in light of his unique skill set.  And

22   I find it hard to believe that a hospital would forego that

23   because he was incarcerated.  Instead he does have an important

24   role to play in the medical community in this city, and both the

02:51  25   Medical Board and the hospitals where he practice are going to

1    recognize that when deciding how to deal with this case.

2         And that brings us to the defendant's argument that

3    this court needs to consider the detrimental effects on the

4    doctor's patients if he's incarcerated.  He is claiming that

5    people will die if he goes to prison.  And that is a bold claim.

6    He may be the only surgeon in Milwaukee that performs his

7    particular subspecialty, but he doesn't account for doctors in

8    other parts of Wisconsin, in Chicago which, at most, a two-hour

9    drive away.  It is certainly not unheard of this in this country

10   for people who are in dire need of specialized medical care to

11   travel in order to seek that medical care.  Just think of the

12   more than a million people every year that go to the Mayo Clinic

13   to seek specialized treatment there, traveling from all parts of

14   the world.

15        Receiving high-quality care is not always convenient

16   for patients, but it's certainly not as if a person is going to

17   forego that care because they have to drive to Chicago to meet

18   with a doctor.

19        And what's possibly most troubling about his argument

20   is he's essentially saying that a doctor should be permitted to

21   violate the law with impunity simply because he provides a

22   valuable service to his community.  And that simply cannot be

23   true.  Doctors, like any other person in any other profession

24   who comes before this court, need to be held responsible for

25   violations of the law.

1    And allowing surgeons to avoid jail time simply

2  because they are surgeons is not going to deter other people in

3  the defendant's position from committing similar crimes in the

4  future.  Instead it will tell them that they have nothing to

5  fear because they are so important that no one's gonna send them

6  to jail.

7    Your Honor, focusing so heavily on the effects of

8  incarceration on third parties significantly overshadows another

9  sentencing factor that the Court needs to consider which is the

10  need to provide just punishment.

11    A sentence of probation in this case would not provide

12  just punishment for the offenses.  And, in fact, the realities

13  of this case demonstrate that a sentence of probation is

14  essentially no sentence at all.  Because a sentence that a

15  person is going to regard as trivial, that's not just punishment

16  for an offense.

17    When determining how this sentence is going to be

18  regarded by the defendant, the Court should look at how he was

19  affected by pretrial supervision in this case.  Because that's

20  the best indication we have about how he's going to be impacted

21  by a sentence that does not include incarceration.

22    If Your Honor looks at the docket in this case it

23  reflects that under the -- that during the approximately

24  one-year period he was under indictment he was granted

25  permission to travel outside of the district approximately 20

1    times.  He went on vacation.  He visited family and friends.  He

2    spoke at medical conferences.  He went to his house in Aspin.

3    If that's what life is going to be like for him on probation,

4    then how can a sentence of probation --

02:54    5    THE COURT:  It wouldn't.  I would tell you right now.

6    It wouldn't be that way.

7    MS. SISKIND:  Your Honor, it still brings us back to

8    the point that it needs to be a sentence that is going to be

9    regarded as significant by the defendant.  And I would submit

02:55    10    that a sentence of probation will have a limited impact on the

11    defendant's life, and that cannot be just punishment for the

12    offense.

13    THE COURT:  So what under the circumstances do you

14    believe is reasonable but no greater than necessary under all

02:55    15    the circumstances, taking into account the factors that the

16    defense has cited and what you just mentioned?  In particular,

17    Dr. Ahuja's specialty; Dr. Ahuja's lack of a criminal record;

18    the seriousness of his two crimes; the need to deter him and

19    others from engaging in similar conduct in the future; as well

02:56    20    as, and I think this is an important thing, the need to avoid

21    unwarranted disparities in sentencing.

22    MS. SISKIND:  Your Honor, I'm glad you mentioned the

23    unwarranted sentencing disparities.  And both sides have cited

24    different cases in their respective submissions on that issue.

02:56    25    This is the first case of its kind to go to trial.

1  All of the other cases cited particularly in the government's

2  paper are individuals with offshore bank accounts who before

3  they were indicted came into court, accepted responsibility,

4  many of them agreeing to cooperate against the banks where they

02:56  5  had accounts, and pled guilty.

6       That is different than a defendant who does not accept

7  responsibility, does not agree to cooperate, and puts the

8  government to its burden of proof.  Which is his constitutional

9  right.  But still, the guidelines reflect a difference in how

02:57  10  people should be treated if they plea or if they go to trial

11  with acceptance of responsibility.  And this is not a defendant

12  who's accepted responsibility for his offenses.  It's not a

13  defendant who came in early before indictment and pled guilty.

14       And so when we have these cases of people -- that are

02:57  15  cited in our papers -- of people that receive probation, those

16  already are significant departures below their respective

17  guideline ranges.

18       So in this case, to have a guideline range as high as

19  the defendant does, even if the Court were to vary downward from

02:57  20  that range to reflect some of the specific circumstances of this

21  case including his profession and the effect on patients.  It

22  still puts us in a position where some sentence of

23  incarceration, some term that is significant enough to make an

24  impression on this defendant and make an impression on other

02:57  25  people like him out there.  A sentence of incarceration that is

45

1    significant enough to reflect that over a multiyear period he

2    deprived the United States of a significant amount of tax

3    revenue.

4         So whether that sentence is within the guideline range

5    or not, the government does believe that the sentence needs to

6    include a period of incarceration.

7         THE COURT:  Thank you greatly.

8         MR. WEBB:  Your Honor, and I apologize for my cold and

9    I'm going to try to speak into the microphone.  If you don't

10   hear me just tell me.

11        I understand the sentencing guideline decisions you've

12   made, and I accept them, of course.  The -- as Your Honor knows,

13   since Booker those guideline ranges are purely advisory and

14   Your Honor has every right to pick the appropriate sentence you

15   believe is justified based on the specific facts and

16   circumstances of this case.  That's the progeny of Booker and we

17   all are very much aware of that.

18        I'm going to talk for a bit here.  I'm going to try to

19   be concise but I have some points I want to make.  But let me

20   start with my conclusion.

21        We believe that the appropriate sentence in this case

22   is probation.  And we believe the appropriate sentence is

23   probation because of very specific unique factors that relate to

24   Dr. Ahuja.  All we do is respectfully ask Your Honor to

25   individualize these factors and apply them to Dr. Ahuja, and we

1    believe — we respectfully suggest to you anyway — that the

2    appropriate sentence should be probation.

3          And the first factor I want to talk about is what the

4    government alluded to which I'll call -- that's referred to

02:59    5    under the case law as "collateral consequences to innocent third

6    parties," which the government agrees and everyone agrees is an

7    appropriate consideration for Your Honor to take into

8    consideration in reaching a decision in this case.

9          And we cite a number of cases, and I'll come to them

02:59    10    in a moment, where courts have held that those factors can very

11    well lead to probation because of the collateral consequences.

12    This is an extraordinary, unique case.

13          THE COURT:  But in that connection I did not note in

14    your memorandum any significant discussion of the other members

03:00    15    of Dr. Ahuja's practice group.

16          MR. WEBB:  I'm sorry, I didn't hear the last part of

17    your question.

18          THE COURT:  I do not recall seeing anything regarding

19    other members of Dr. Ahuja's practice group.

03:00    20          MR. WEBB:  We have a letter from one of those that's

21    referred to, Your Honor.  It's actually -- it's the -- it's

22    Dr. William McCallum.  That's one of the neurosurgeons.  It's in

23    the -- it should be in Tab 61 of the binder that we gave you of

24    letters from different people.  Do you have a binder?

03:00    25          THE COURT:  Somewhere.

1    MR. WEBB:  And I can get you a copy of the letter if

2  you'd like, Your Honor.

3    THE COURT:  Yes, I have it.  All right, I have it.

4    MR. WEBB:  And what he points out, he addresses --

5  he's one of the neurosurgeons that the government says they

6  believe can just pick up Dr. Ahuja's practice.  And what he

7  says, and I'll quote from one paragraph of his letter.

8    "Our group is composed of five neurosurgeons including

9  Arvind.  However, it would not be practical to reassign his

10  patients if Dr. Ahuja is not practicing.  Dr. Ahuja's patient

11  base represents such a large volume there is no way myself and

12  the other partners could absorb them into our practices while

13  assuring appropriate attention."

14    Second, and this is the most important I believe:

15    "None of the other four partners are trained as

16  endovascular neurosurgeons and do not perform many of the

17  procedures that Arvind performs."

18    And that is the point I want to make, Your Honor, is

19  that I don't think -- I know I've never been at a sentencing

20  where I ever suggested to a judge that my client was

21  irreplaceable.  And if I should be sentenced some day no one

22  could suggest I'm not, I can tell you that.  But I will say, and

23  I try to say this without overstating it, as far as being an

24  endovascular neurosurgeon in the Milwaukee area, he is

25  irreplaceable.  I have learned that from talking to so many

48

1    people in gathering these letters today.

2           This is an extraordinary circumstance.  But the fact

3    is you've got these doctor letters from people in this community

4    that have pointed out that what he does -- by the way, I think

5    he was the second person licensed in this whole nation to be an

6    endovascular neurosurgeon.  And he brought this practice to

7    Milwaukee.  And he may be the best in the country at doing it.

8    And he's certainly by far -- there's no one around here that

9    does it.

10          And what that does is I think -- I don't want to

11   get -- he basically -- you don't have to crack someone's skull.

12   They snake a wire up through your arteries from your groin up

13   and you end up in the brain and the things they can do up there,

14   Your Honor, as far as doing actual surgeries and/or dissolving

15   clots with strokes, it's truly a phenomenal thing he does.

16          And what counsel says, well, let them go to Chicago.

17   Well, you've got letters, I'll come to one in a minute, where

18   doctors are saying that's just not realistic if you're dealing

19   with someone that we -- to be able to dissolve that clot, save

20   that person's life, or at least make sure they don't have

21   long-term disabilities, we're not gonna put them in a car to

22   Chicago.  It is not going to work.  And that's what the doctors

23   have said.  And that's the truth.

24          I'm not going to be overly -- how do I know if he's

25   going to save lives?  He's saved hundreds of lives over the

1    years because he can do this and there's undoubtedly going to be

2    some in the future.  My only point is that there is nobody else

3    here that can do that.  And we've put this forth in the letters

4    over and over again in our briefs.  And I could call more of

5    them to Your Honor's attention than I already have, but I want

6    to quote from one.

7        Dr. Bobustuc, who is a very prominent surgeon here in

8    Milwaukee, this is the way -- I read from his letter which is

9    letter number 2 in your binder.  Here's what he said:

10       "I know there will be patients who will not be able to

11   go to Chicago in a heartbeat, or not have the right insurance

12   which for Arvind has never been an issue, and I know that some

13   of them will die.  This is the basic truth."

14       Now, that's what this doctor said to this court and

15   the government doesn't dispute.  There is no other endovascular

16   neurosurgeon in this area.  Zero.  And these other neurosurgeons

17   admit over and over again they cannot do what he does.

18       And so when you're dealing -- and, by the way, his --

19   he has -- Your Honor, he's got -- besides the surgeries he's

20   doing now, he's got thousands of patients he's actually still

21   seeing at least on an occasional basis that come back for

22   treatment from him.

23       But, you know, if you want to talk about sentencing

24   him, besides all of that, what I was even maybe more impressed

25   with and I'll just emphasize to Your Honor — besides that he's

1    the only one that can do it — he's the only neurosurgeon in this

2    city that has the track record that when people are uninsured

3    and cannot afford what he does, he will do it.  In fact, we've

4    given you letter after letter.  When patients call up and say to

5    him "I'm not going to keep my appointment because I can't pay

6    anymore," and he brings them in every single time to perform the

7    procedures on them.

8        So anyway, this is set forth over and over again in

9    these letters, that he does things here to treat patients over

10   and over again.

11       One of patients is Bart, B., Tab 18.  She wrote of how

12   her insurance carrier refused coverage for several delicate

13   brain surgeries that Dr. Ahuja was performing while treating

14   her.  When the patient discussed her inability to pay and her

15   insurance problems that developed during treatment, Dr. Ahuja

16   said, "You come in here, I will absorb the entire bill of

17   $150,000."

18       Your Honor, there are many letters like that spread

19   throughout what we put in your binder there.  And it's true.  He

20   is irreplaceable in this community.  Now the question is:  Well,

21   what's the difference between jail time and probation?  And I've

22   done the best I can.

23       I've given you a letter which is tab 106, Jack Zwieg.

24   He's the most experienced attorney I could find in Wisconsin who

25   spent 30 years working for the Wisconsin Medical Board handling

51

1    disciplinary proceedings for that board.  And he has done a

2    five-year survey.  A five-year survey.  I'm not trying to guess

3    and speculate, I'm doing the best I can with what exists out

4    there in the world.  He's done a five-year survey.  And what he

5    has told the Court in his letter is that he has found 20

6    disciplinary orders against doctors in cases resulting from

7    criminal convictions which were the basis for the

8    disqualification.

9          So I have a universe of 20.  15 of the 20 cases ended

10   up with jail sentences.  And in those 15 cases the board

11   suspended, revoked -- or revoked the doctor's license.  There

12   are five cases where the doctor got probation, and all five

13   cases the medical disciplinary board gave that doctor a

14   reprimand so he could continue to practice medicine.

15         Now, that's the best data I have in this state today.

16   And I don't doubt for a minute that the way Your Honor's gonna

17   view this case in your judgment and wisdom is going to have an

18   enormous impact on that medical disciplinary board.  If you

19   decide that the appropriate sentence based on all the

20   circumstances is probation, I don't doubt for a minute that he

21   will be able to maintain his license because of the value he's

22   got to this community.  Can I guarantee it?  No.  But I speak

23   from everything I can glean from the statistics and facts that

24   we have.

25         So collateral consequences, we cited case after -- the

1  cases, by the way, that both sides have cited, things such as

2  your employees are gonna lose their job, found to be good enough

3  for probation.

4      A water treatment company didn't -- thought that this

5  one defendant was so valuable in treating water, even though

6  there's others that might do it, the court said no probation.

7  And so you've got these cases here.  Another was someone who was

8  exceptionally talented in her catering business.

9      Compared to the collateral consequence in this case,

10 there's enormous authority out there that this collateral

11 consequence issue -- I don't see any other case where you can

12 have this type of collateral consequence.

13     And, by the way, what probably pales in comparison but

14 it's true in this case, he does employ about 30 people in his

15 practice.  And if he's sent to jail and his license is revoked

16 and his practice is shut down, those 30 people are going to be

17 unemployed.  And hopefully people will find places for them.

18 And I'm not -- but they will not have a job anymore because that

19 clinic, his practice, will be shut down.

20     So, Your Honor, yes, you can tell I feel pretty

21 emotional about this.  This is a unique case.  This is a unique

22 circumstance.  And because of his skills and because of what's

23 going to happen if he goes to jail, I respectfully suggest that

24 the appropriate sentence is probation.

25     But, I don't have to stop there.  I can at least

1    mention some other factors under 3553(a) that I believe are

2    consistent and put a -- let's call them an additive value for

3    probation and not the least of which, by the way, is the actual

4    nature and circumstance of his crime.

03:10    5    I'm not going to minimize it.  He was convicted of two

6    felonies.  But he was -- you know, we started this case with a

7    conspiracy count which left the case because they couldn't prove

8    any conspiracy with anyone at HSBC.  That's where we started the

9    case, with the big serious conspiracy charge gone.

03:10    10    Then we go through eight counts.  You threw one count

11    out for lack of evidence.  Seven go to a jury, five of them come

12    back not guilty.  And the two that he was found guilty of, it is

13    basically for not disclosing that he had foreign bank accounts,

14    not for not reporting income.

03:11    15    I won't minimize it.  They're felonies.  But it's

16    felonies dealing with not disclosing that you have foreign bank

17    accounts.  So if you're talking about, in the scheme of the

18    world out here, of serious tax cases, this is not one of them.

19    And, by the way --

03:11    20    THE COURT:  Well, it depends on how seriously you

21    believe the government takes unreported foreign income.

22    MR. WEBB:  I want to talk about that.  Can I answer

23    that question?  That's a fair question.

24    THE COURT:  Yes.

03:11    25    MR. WEBB:  I do believe sometimes our lives are so

54

1    wrapped up with fate and events that sometimes we don't have

2    total control over.  The government has amnesty for this -- they

3    have amnesty programs for this very issue of foreign income.

4    There are 30,000 people that got amnesty during this time period

5    when Dr. Ahuja got singled out to be indicted.  No review of the

6    facts.

7         People that had shell corporations, huge amounts of

8    money, lying, stealing, cheating on the way they set these

9    foreign accounts up.  He doesn't do it that way.  His is all in

10   his own name.  Anyway, they don't get charged.  They don't get

11   indicted at all because they filed the application for amnesty.

12   He didn't.  And do you want to know why?  Because he honestly

13   didn't know that HSBC had not sent him 1099 forms.

14        And so then they sent him a target letter and said

15   oops, you're out of luck, Doctor.  You got a target letter, we

16   tried to do it, and they said, nope, you can't do it, and you're

17   going to be prosecuted.

18        So as far as -- I'm not -- yeah, I'll accept that

19   there's two felonies and they're here and we accept that.  But

20   as far as the seriousness in light of the amnesty program, at

21   least I think it's something for Your Honor to look at.  And the

22   fact by the way --

23        THE COURT:  Of course, you did argue the amnesty issue

24   early in this case.

25        MR. WEBB:  We did, Your Honor.  But I'm just pointing

55

1    out as far as -- well, I point it out for what it's worth.

2            As far as the seriousness of the crime, it is only

3    2 percent of his -- of the taxes that he owed.  He did pay all

4    of the taxes due and owing long before this indictment came

03:13  5    down.  That's gotta be in his favor.

6            And, by the way, he reports every -- this is interest

7    income.  All the money that -- he's given the federal government

8    tens of millions of dollars for his medical income.  And so this

9    is not some tax cheat that hasn't paid huge sums of money to the

03:13  10   government.

11           All these are factors that I just respectfully ask

12   that you consider when you consider the nature of the crime as

13   he stands before you convicted.  And of course --

14           THE COURT:  I do have to say that I agree with what

03:13  15   you said regarding payment of taxes.  To the extent that your

16   client did submit what he believed were properly due and owing

17   taxes, that weighs heavily in his favor.

18           MR. WEBB:  Okay, thank you.  I mean, he has paid huge

19   amounts of money in taxes, tens of millions of dollars over the

03:14  20   years.  No allegation that he ever didn't pay a dime in his --

21   all the income that he had from medical.

22           And, by the way, he reported all his interest income

23   too, other than this 1099 from this particular company.  But I'm

24   not going to reargue the facts.  They're there.

03:14  25           THE COURT:  What I would like you to address is

56

1     whether or not your requested probationary sentence would be

2     inappropriate considering other cases where people have evaded

3     taxes or filed false returns and have, in fact, been sentenced

4     by not just this court but other courts.

5             MR. WEBB:  I'll address that.  Maybe the best way to

6     address it is, I went back this morning and looked at the briefs

7     we filed on this issue of sentencing, disparity of sentencing

8     issue.  As far as the briefs that we filed, both sides cite tax

9     cases to argue to you what the appropriate sentence would be.

10    So both sides did that.

11            I count, if my count is correct, between the two

12    parties we cite to you 14 tax cases to argue what each side

13    thinks should be the appropriate sentence.  So we got 14.  12 of

14    them resulted in probation.  12 of those sentences are probation

15    out of 14 that both sides called to your attention.  One of them

16    was a one day of jail.  So one -- so I got 12 probations, one

17    case one day in jail, and then one outlier, one year and one day

18    in jail.  From 14 different cases.

19            So this case, if you decide to --

20            THE COURT:  I believe there must have been another one

21    because I believe I sentenced someone recently to --

22            MR. WEBB:  I think these are the cases that are not

23    Judge -- is that correct?  I want to make sure of that.

24            THE COURT:  If I recall the government cited my case

25    in its brief.

57

1          MR. WEBB:  Your Honor, these are the offshore account

2    cases that we're trying to --

3          THE COURT:  You're only referring to offshore account

4    cases.

5          MR. WEBB:  Yes, I'm on offshore account cases because

6    I thought that was most applicable to this case.

7          THE COURT:  Okay.

8          MR. WEBB:  So those cases would show that if you

9    decide to impose probation because he did not properly handle

10   his offshore accounts, that you're in very good territory of

11   imposing probation.

12         Now, if you impose probation, let me respectfully have

13   a suggestion or at least a -- that we could do a sentence of

14   probation that would help him maintain his license and benefit I

15   don't know how many people that are his patients now or in the

16   future.  But also you can impose, in your judgment and

17   discretion, a period of community service where he has to donate

18   time to some worthy organization during his time of probation.

19         We've actually -- this would be entirely up to you and

20   any program you wanted, but we've looked into that.  And there

21   are programs out there.  Actually the one we've been dealing

22   with is, it's called the United Neighborhood Centers.  They

23   basically have 10 organizations that provide services to

24   underserved people in the Milwaukee area.  There's a Mr. Cox

25   there that runs one of their organizations, and we've talked to

1    him about whether he would be willing to, if you will, supervise

2    Dr. Ahuja to certify to the Court that Dr. Ahuja performed

3    community service consistent with whatever you might decide.

4    Whatever.  You pick a number of hours.

5            But there's two medical centers that are part of their

6    organization.  And while he would go there and he would work the

7    number of hours donating his time to the community, and he's

8    somewhat of an expert on what's called "outreach" because he set

9    up two different stroke centers over the years where people can

10   come in if they're having a stroke and get that blood clot

11   dissolved quickly.  Those programs are key to outreach where you

12   have to educate people that they exist or they won't come into

13   centers.

14           And so he could work at these centers and work in --

15   both in the centers providing medical services and also help

16   them in outreach.  And so that period -- that condition of

17   probation which is in Your Honor's discretion would have the

18   ability of not only preserving him as a doctor in endovascular

19   neurosurgery and for his patients, but it would also be helpful

20   to the community.

21           And, by the way, he's a first-time offender.  I mean,

22   he's never done anything wrong in his life.  Look, I could go on

23   and on about his family.  This Indian is such a tight-knit

24   family.  The loyalty that he has to this family and how tight it

25   is and how close they are, everything about this man's life.

1     But you are sentencing a good man. If you read those

2  letters, his staff talked over and over again how it doesn't

3  matter whether he's on vacation. It didn't even matter when --

4  when he was on trial before you I told him "you do not go to

5  that hospital, I need you here," he went to the hospital. He

6  performed several surgeries while this case was ongoing. And

7  his staff submitted written letters explaining "because people

8  had to have it done." And so he snuck away from me and went to

9  the hospital at night and performed surgeries because that's

10  what -- and he's done it his entire life.

11     And these uninsured patients. One of the staff

12  members said I have never seen him -- every single time it's

13  happened when someone has no insurance, when he had no insurance

14  he insists they gotta come in and they gotta be treated. And

15  he's done it consistently.

16     He is a good man. He's not a bad person. He's a

17  first-time offender. And there's conditions you can put on

18  probation. And I just respectfully ask Your Honor to consider

19  probation.

20     Thank you.

21     THE COURT: Thank you, Mr. Webb.

22     Mr. Karolewicz, is there anything that you can add

23  that may be helpful?

24     PROBATION OFFICER: I would just add that he did come

25  in today and submit a urine screen which tested negative for

1  controlled substances.  And he continued to comply with your

2  order and gave us all of his travel itineraries up to today.

3            THE COURT:  Thank you greatly.

4            Dr. Ahuja, you certainly have the right to be heard at

03:20  5  this stage if you wish to make any statements.  However, I do

6  also emphasize you are not required to make any statements.

7            THE DEFENDANT:  If I could.  Can we take a two-minute

8  break?

9            THE COURT:  Surely.  We'll take a break.

03:21  10           THE BAILIFF:  All rise.

11           (Recess taken at 3:21 p.m., until 3:40 p.m.)

12           THE COURT:  Dr. Ahuja, do you wish to be heard?

13           THE DEFENDANT:  Yes, I do.  Thank you.  Thank you for

14  the bathroom break.

15           (Brief pause.)

16           THE DEFENDANT:  Sorry.

17           THE COURT:  That's okay.

18           THE DEFENDANT:  I've prepared some notes to help me do

19  my presentation today.

03:41  20           Your Honor, I read the papers that have been submitted

21  to the Court.  I've listened to Mr. Webb's statement about me,

22  about my life, my patients, and my effect on the community.  And

23  I must tell you that I'm truly humbled in all that's been said

24  and written.

03:42  25           I strongly believe that anything I have achieved is

1    due to God's blessing and my parents' hard work and sacrifice.

2    Despite what anybody may say or present, the last two years have

3    been a very painful part of my life.  But I had to get through

4    that, for my kids and over 27,000 patients I have to take care

03:42  5    of.  As Mr. Webb said, even when I'm in trial worrying about my

6    life, I worked before and after because I couldn't say no.

7            I'm extremely sorry for my role in bringing all of us

8    here today.  In my medical practice I'm ultimately responsible

9    for every procedure that's performed.  This is true regarding

03:43  10   any action taken by me or a member of my team.

11           It is the same in this case.  Even though I assigned

12   the responsibility to my accountants in preparation of my tax

13   returns, I signed them.  And I should have done more.  And I am

14   the one ultimately responsible for the errors in those returns,

03:43  15   and I'm deeply sorry.

16           I did not dedicate my life of being a neurosurgeon for

17   pursuit of money or being recognized.  The reason I love my work

18   is that I can help people, and that is what gives meaning to my

19   life.  If it was greed that I wanted to make extra money, I

03:44  20   wouldn't be donating four to five times the money every year

21   that I paid in any tax.  And it's never been about money for me.

22           And I feel great sorrow for the effect that my errors

23   may have on my wife, children, my four parents and my patients.

24   I really would like to deeply thank them for their support.

03:44  25   Without their support, I could not be here without them.

1    I come before the Court today believing in all my

2    heart that my life's work hangs in the balance based on your

3    decision.  But I will not let you down.  And in my heart never

4    did I want to cheat or nudge the system.  If I'm sentenced to

5    prison time I do not believe that I will be able to continue

6    practicing neurosurgery and help those that need my help.  And

7    more than anything, the penalty would also cut my heart out.

8    And, Your Honor, if I receive probation and able to

9    continue in my medical practice, I pledge never to stray from my

10   obligation to follow the law and, with God's help, would do my

11   very best to serve my patients.  And I will continue to be

12   deeply committed to fulfilling the community service that my

13   counsel has discussed with this court and really continue to

14   make a meaningful difference for additional patients in this

15   community.

16   I thank you for all the efforts you made in the trial

17   for this case, and to give me the opportunity to express the

18   truth that's in my heart.

19   Thank you.

20   THE COURT:  Thank you.

21   Dr. Arvind Ahuja, you were adjudged guilty on Counts 5

22   and 9 of the indictment, following a trial on August 23rd of

23   last year.  The charges were for filing a false income tax

24   return, contrary to Section 7206(1) of Title 26, and failure to

25   file reports of foreign bank and financial accounts, Count 9,

63

1  contrary to Sections 5314 and 5322 of Title 31 of the U.S. Code.

2         The Court has heard arguments respecting the

3  guidelines and has determined, after hearing those arguments and

4  deciding your objections, that you are at offense level 20 of

5  criminal history category I, which translates into an advisory

6  guideline range of from 33 to 41 months of imprisonment as to

7  those counts of conviction, at least 1 but not more than 3 years

8  supervised release, and a fine range of from 7500 to $75,000,

9  coupled with a special assessment of $200.

10         The Court further notes that the statutes involved set

11  a maximum fine of $100,000 as to Count 1 and $250,000 as to -- I

12  said Count 1, it's Count 5 -- and $250,000 as to Count 9.

13         The government has requested a period of

14  incarceration, and the defense has requested a sentence of

15  probation.

16         The Court is mindful of the sentencing factors that

17  have to be taken into account under 18 U.S.C. Section

18  3553(a)(2).  And any sentence imposed should therefore take into

19  account the seriousness of the offense, the need to promote

20  respect for the law, the need to impose a just sentence that is

21  in the form of punishment, and is reasonable under all the

22  circumstances so as to deter future criminal conduct with regard

23  to you in particular and others in general.

24         There's also a need to protect the public under

25  certain circumstances, and here I don't believe that is a

1    substantial factor.

2            Further, the Court must not impose a sentence that's

3    inordinately disparate if under the circumstances that's

4    inappropriate.  So the Court does have to determine whether or

03:50  5    not a sentence will be out of line with other sentences in

6    similar cases.

7            The Court has heard a number of arguments with regard

8    to why you should be incarcerated, Dr. Ahuja.  One such argument

9    is the fact that you concealed substantial interest income by

03:50  10   virtue of your conduct, and you frustrated the interest of the

11   government in uncovering foreign bank accounts.

12           The defense has also pointed out the nature of your

13   work; the impact of any sentence of incarceration on your

14   patients; as well as the hospitals where you practice and the

03:51  15   group with whom you practice medicine.

16           The Court has also been made aware of the high regard

17   that your patients have for your work; your efforts to provide

18   needed medical care to persons who are unable to afford such

19   care out of their own meager means; the fact that you paid taxes

03:52  20   on income that had previously been unreported, although that

21   came somewhat tardily and after it was apparent that you were

22   under suspicion and investigation.

23           The Court has also been told how a period of

24   incarceration may impact your livelihood, and in particular your

03:52  25   ability to continue practicing medicine.

1        It has also been noted that you are open to providing

2   community service in the form of healthcare if you're given an

3   opportunity to do so.

4        Your ability to access various hospitals if you are

03:53   5   given a sentence that involves confinement has also been brought

6   to the Court's attention.

7        I have weighed these matters and all of the issues

8   that the defense and the government have raised today.  I've

9   given thought to other cases involving medical professionals who

03:54   10   have been in this court, defendants who have come before this

11   court in tax cases, and the cases that both sides have cited in

12   their submissions.  And I will tell you that all of them

13   indicate to me that this is a rather unusual case, one that does

14   not provide clear lines that this court should follow.

03:55   15       And so, in the final analysis, this court has to treat

16   you in a somewhat unique way.  In my judgment, punishment is

17   required.  Responsibility for your crimes must be shouldered by

18   you as a result of the expensive and rather drawn-out

19   proceedings that have been brought by the government.  It has to

03:56   20   be made clear that it is essential that offshore income earned

21   by taxpayers must be reported, and that taxpayers such as

22   yourself who earn such income, particularly substantial income

23   as in this case, have to report that income and decline to hide

24   behind the smoke and mountains of paper and layers of clouds

03:57   25   that may obscure from the government the funds that they've

1    earned outside of the United States.

2         Therefore, it's my judgment that as to Counts 5 and 9

3    of the indictment that you serve a term of three years of

4    probation with six months of home confinement.

5         In addition, let me point out that that term varies

6    substantially from the guidelines in this case.  And, that that

7    term takes into account the factors that have been cited,

8    particularly those concerning the impact of this sentence on

9    third parties, not the least of whom are your patients.

10         It also serves as notice generally that it is

11    essential that taxpayers file accurate returns and disclose

12    their offshore income.

13         Now, in addition, the Court is of the view that fines

14    are appropriate here.  The Court is therefore imposing a fine of

15    $100,000 as to Count 5 and $250,000 as to Count 9, for a total

16    of $350,000 in fines.  Those fines are greater than the

17    guidelines call for.  But in order for this court to provide

18    measured punishment within the statutes and to deter not just

19    you but others, the Court is satisfied that this is reasonable

20    under all the circumstances in this case.

21         Additionally, special assessments of $100 are imposed

22    on each count, for a total of $200 in the special assessments.

23         With regard to the probationary term and the period of

24    home confinement, the Court notes that your probation will

25    commence today.  And, that you must comply with the standard

1    conditions of probation which have been adopted by this court,

2    coupled with special conditions as follows:

3              You are allowed to work during your term of probation

4    with such work hours to be determined in conjunction with your

04:01  5    supervising probation officer.  I'm not going to fix those hours

6    at this time for several reasons, not the least of which is

7    emergencies certainly arise within the medical profession.  And

8    if there are emergencies I am satisfied that it will be

9    appropriate for those to be accommodated, within reason.

04:02  10             While you're on probation you are required to perform

11    each year 150 hours of community service as approved by your

12    supervising probation officer, as to each one of the years of

13    probation.

14             You may not during your probationary period possess

04:02  15    any firearms, ammunition or dangerous weapons, as such

16    possession will result in revocation of your supervision term.

17    Nor may you illegally possess any controlled substances, as such

18    possession will also result in revocation of your probationary

19    term.

04:03  20             The Court is of the view that you are at low risk for

21    illegal drug use and, therefore, I am going to suspend the drug

22    testing requirement.

23             You are also required to cooperate with the Internal

24    Revenue Service in the preparation of any tax returns that may

04:03  25    be due and owing.

1      And you are required to provide to your supervising

2  probation officer monthly financial reports as well as copies of

3  your federal and state income tax returns which returns are to

4  be timely filed and submitted immediately after they have been

5  filed.

6      Lastly, inasmuch as you've gone to trial in this case

7  you are entitled to appeal your convictions.  If you wish to

8  have the clerk of court file a notice of appeal on your behalf

9  you must make that known before you leave the courtroom today.

10      Alternatively, you will have 14 days after the

11 judgment of conviction has been docketed to file a notice of

12 appeal on your own or to have your counsel file that notice of

13 appeal.

14      Your counsel is to consult with you respecting your

15 appeal rights and is asked to submit a report verifying that you

16 have met with respect to the same.

17      Under all the circumstances do you wish to have the

18 clerk file a notice of appeal?

19      THE DEFENDANT:  No.

20      THE COURT:  All right.  You still have the other

21 option which is, if you change your mind, and to submit the

22 notice of appeal through counsel or on your own.

23      Is there anything else from the defense?

24      MR. WEBB:  No, Your Honor.  Just maybe one

25 clarification which I believe I can understand, but during the

1    time of probation he can work.  I take it that also includes the

2    home confinement.  During the home confinement part of the

3    probation he can go to work in his medical practice.

4         THE COURT:  That is correct.

04:05  5         MR. WEBB:  Thank you.

6         THE COURT:  I mentioned something earlier and I need

7    to make this clear.

8         Throughout probation Dr. Ahuja is not to travel

9    internationally and he is not to travel outside of Wisconsin

04:06  10   except as essential to maintaining his credentials or for health

11   reasons, other than the need to have rest and relaxation.  In

12   other words, I don't want him to ask for time to go on a

13   vacation outside of the state of Wisconsin.  I want his travel

14   to be restricted.  And if he has extra time, I would expect that

04:07  15   extra time will be used for the purposes that you mentioned,

16   that is, Dr. Ahuja's desire to provide some healthcare and

17   assistance within this community.  I want this to be rather

18   restricted probation.

19        THE DEFENDANT:  Can I ask a question?

04:07  20        THE COURT:  Yes.

21        MR. WEBB:  Your Honor, one question.  He has children

22   that are outside --

23        THE COURT:  I understand that.  If he were

24   incarcerated they'd have to come to him.

04:07  25        MR. WEBB:  Yes, Your Honor.  One second, Your Honor.

1    THE COURT:  That's certainly better than
2 incarceration.
3    MR. WEBB:  Your Honor, we understand completely.  Can
4 we at least have the option to come back -- there may be special
04:07    5 events that will be at their children's schools.
6    THE COURT:  I understand that.  No.  No.
7    Now, I did not articulate how the fines are to be
8 paid.  Do you wish to be heard in that regard?  Because I will
9 tell you under most circumstances I will limit a defendant's
04:08   10 ability to transfer any property without the prior approval of
11 the court, at least to the extent that that property is valued
12 at a sum in excess of $500.
13    Do you have any comments you would like to make with
14 regard to the payment of the fine?  Otherwise I'll address that
04:08   15 before we conclude.
16    MR. WEBB:  We will have the fine paid by Monday.
17    THE COURT:  All right.  And if that fine is not paid
18 by Monday then what I will do is address that in a further
19 determination.
04:09   20    Does the government wish to be heard?
21    MS. SISKIND:  No, Your Honor.
22    THE COURT:  Let me see if there's anything else I need
23 to address.
24    All right.  I think that I've addressed the counts of
04:09   25 conviction which are Counts 5 and 9.  We've disposed of the

1    other -- the other counts have been disposed of by the jury and

2    the Court.

3            Are there any issues that were raised in your

4    memoranda that you'd like to bring up before we conclude?  I

04:10    5    just want to make sure I did not miss any issues that were

6    raised.

7            MS. SISKIND:  Nothing from the government, Your Honor.

8            MR. WEBB:  No, Your Honor.

9            THE COURT:  Very well.  All right, we stand in recess.

04:10    10            (Proceedings concluded at 4:10 p.m.)

11                    *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF WISCONSIN

3

4            I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

5    Reporter for the United States District Court, Eastern District

6    of Wisconsin, do hereby certify that I reported the foregoing

7    proceedings, and that the same is true and correct in accordance

8    with my original machine shorthand notes taken at said time and

9    place.

10   Dated this 4th day of February, 2013

11   Milwaukee, Wisconsin.

12

13   _____

          Official Court Reporter

14        United States District Court

15

16

17

18

19

20

21

22

23

24

25